**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190503-U

Order filed January 14, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* N.C., | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| a Minor | ) | Iroquois County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-19-0503 |
| | ) | Circuit No. 17-JA-4 |
| v. | ) | |
| | ) | |
| R.S., | ) | |
| | ) | The Honorable |
| Respondent-Appellant). | ) | James Kinzer, |
| | ) | Judge Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Presiding Justice Lytton and Justice Carter concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    The trial court's findings (1) that respondent was unfit parent of his minor daughter and (2) that it was in the best interest of the child that respondent's parental right be terminated were not against the manifest weight of the evidence.

¶ 2    Respondent, R.S., appeals from the judgment of the circuit court finding him to be an unfit parent of his minor child, N.C., and terminating his parental rights. Respondent does not

claim that the trial court erred in finding that that he failed to make reasonable progress toward the return home of his child within the relevant nine-month period. Instead, he argues that he had made reasonable progress outside of the nine-month and that the trial court failed to consider this progress in evaluating the child's best interest. We affirm.

¶ 3                                                      FACTS

¶ 4        On April 26, 2017, Ashley C. gave birth to N.C., and tested positive at that time for cocaine, opiates, and THC. After her birth, N.C. was experiencing withdrawal symptoms, difficulty breathing, and had an enlarged heart. N.C. was taken into protective custody on April 30, 2017, and the State subsequently filed a complaint seeking a temporary shelter order and an adjudication of neglect or abuse. The court considered the complaint and ordered temporary shelter care, placing N.C. in the custody of DCFS on May 2, 2017.

¶ 5        On June 2, 2017, respondent and Ashley were interviewed by an Integrated Assessment Team. During the interview, the childhood experiences, drug history, criminal history, and mental health history of both parents were assessed and considered in creating objectives for which each parent was responsible in achieving the overall permanency goal with respect to N.C. The initial permanency goal was "return home in 12 months."

¶ 6        Respondent's interview revealed a history of anger control problems, and the propensity to turn to substance abuse to cope with stress or pain. Additionally, the report indicated that respondent denied having a traumatic past but it noted that he was possibly not being completely open about his experiences. These findings, along with the circumstances that resulted in the removal of N.C. from his care, were considered and incorporated into three service plan objectives, which were:

2

> "Objective #1: [respondent] will achieve and maintain a drug-free level of personal functioning to provide a safe environment for his daughter, [N.C.].
>
> Objective #2: [respondent] will engage in parenting education to be provided support services, linkage to community resources, positive parent-child relationship guidance and socialization, health, safety, and child development.
>
> Objective #3: [respondent] will secure/maintain stable housing and a legal source of income to provide for himself and his [child].
>
> Visitation: ...twice per week for two hours each visit."

¶ 7      On July 14, 2017, the adjudicatory hearing was held where the court made findings of abuse or neglect on the basis that N.C. "as a newborn was exposed to illicit drugs as defined by 705 ILCS 405/2-3(1)(c) after [Ashley] admitted to ingesting non-prescribed Vicodin while pregnant with [N.C.]." The court granted the petition adjudicating N.C. neglected or abused. Importantly, the order admonished the parents that they must cooperate with DCFS and comply with the service plan or risk termination of parental rights.

¶ 8      On July 31, 2017, Children's Home and Aid filed the dispositional report with the court, and a dispositional hearing was held on August 4, 2017. The dispositional report recommended that custody and guardianship of N.C. be placed with DCFS, and that the permanency goal be set as "return home in 12 months." In support of the recommendations, the report provided a thorough review of the progress made by both parents toward each of their respective service plan objectives.

¶ 9      With respect to respondent's progress, the July 31, 2017, report noted that he had not made satisfactory progress toward any of his assigned service plan objectives. Respondent was referred to substance abuse services and submitted to a random drug screening in which he tested positive for marijuana. He failed to appear for subsequent screening. Respondent was also referred for parenting classes but had not scheduled an intake appointment. Respondent was

unemployed but made money selling car parts on E-bay. Respondent lived with Ashley at her grandmother's house but made trips to Flint, Michigan, to make needed repairs to a home he owned there. The report also noted that during visitations with N.C., he engaged appropriately but he did not attend visitations where Ashley had canceled hers and was thus not taking proper advantage of the visitation opportunities that were available to him. At the August 4, 2017, dispositional hearing, the court found both respondent and Ashley to be unfit parents.

¶ 10        On October 25, 2017, DCFS filed the Family Service Plan report based on evaluations made on September 19, 2017 regarding progress on the service plan objectives. With respect to respondent's progress, the report noted that he still had not completed any substance abuse counseling or submitted any further screening and remained unemployed but earning income by selling used car parts on E-bay. The report also noted that respondent had attended an intake appointment for parenting classes, but "no showed" the remaining appointments and had not rescheduled. The report showed that respondent was now attending visitations one day per week for two hours rather than the prescribed twice a week.

¶ 11        At a permanency hearing on February 16, 2018, the court indicated that after reviewing the service plan and the report, the appropriate permanency goal would remain "return home in 12 months" because both respondent and Ashley had failed to make reasonable and substantial progress toward returning N.C. to their home. Following this hearing, Ashley self-reported her use of marijuana and methamphetamine, as well as "things she sometimes don't know what it is" to the DCFS worker, and that her drug use was the reason that she does not go in for her required drug screenings.

¶ 12        DCFS filed an updated service plan report on April 27, 2018, based on evaluations made on April 2, 2018, presenting the progress on the service plan objectives. At the time of this filing,

4

the nine-month statutory period following adjudication of neglect had closed. The report indicated that the progress was still unsatisfactory and that DCFS now recommended changing the permanency goal from "return home" to "substitute care pending Court determination on termination of parental rights." The report revealed that both parents had continued to engage in the same pattern of start-and-stop involvement with N.C. that had been evident in previous reports. At the time of this report, not only had neither parent completed any of the services required under their objectives, but Ashley's whereabouts were now unknown, and respondent was currently incarcerated for outstanding criminal warrants in Michigan and Illinois.

¶ 13        Following this report, the trial court called the case for a permanency hearing on September 18, 2018. The record does not contain a report of the proceedings of this hearing. But the docket sheet recounts that the court's reasons for changing the goal to "substitute care pending Court determination on termination of parental rights" were:

(1) "Services contained by the plan are appropriate to facilitate the achievement of the permanency goal;"

(2) "The selected goal is consistent with the health, safety and best interests of the child;" and

(3) "Services required by the plan have been provided."

¶ 14        The trial court then ordered: "Guardianship of the minor to remain with DCFS with power to place and consent to medical treatment." Both respondent and Ashley were ordered "to cooperate with the plan." The court also set a permanency review for March 1, 2019.

¶ 15        On February 8, 2019, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent was unfit on the basis that: (1) he failed to protect N.C. from conditions within his environment injurious to N.C.'s welfare; (2) he failed to make reasonable efforts to correct the conditions that were the bases of the removal of N.C. from him within nine

5

months after the adjudication of neglect; or (3) he failed to make reasonable progress toward the return of N.C. to him during any nine-month period after the end of the initial nine-month period following the adjudication of neglect.

¶ 16    On February 27, 2019, DCFS filed a final updated service plan report. The report noted that respondent had completed parenting education classes through Iroquois Mental Health, but the agency worker had "not received a progress report or completion certificate" as of the report date. The report also noted that respondent continued "to engage in individual counseling." The agency, however, remained "concerned about [his] source of income and if he [had] the financial capacity to provide long-term care for" N.C. The report then noted that N.C. had "been involved in foster care system" for significant amount of time, which "should be considered." It stated that N.C. had "been removed from her parents care since birth and has integrated and developed significant bonding with the caregivers and their family due to the inconsistency on both [Ashley] and [respondent's] behalf."

¶ 17    The termination hearing was held on August 20, 2019. The designated relevant nine-month period was July 14, 2017, through April 14, 2018. During the fitness portion of the trial, the judge took judicial notice of the July 14, 2017, docket entry where it is noted: (1) that respondent and Ashley admitted the State's petition for adjudication alleging abuse; (2) a caseworker's testimony relating respondent lack of long-term stability; and  (3) the permanency reports and service plans filed during the relevant nine-month period, which detail the lack of progress made by both parents.

¶ 18    At trial, the State called Amanda Williams, an agent of DCFS, to testify to the objectives in place and the level of progress that had been made with respect to those objectives. She oversaw N.C.'s case. She stated that services were assigned to respondent during the period

spanning July 14, 2017, through April 14, 2018. He was assigned to parenting education classes, substance abuse classes and individual counseling. Williams stated that during the relevant period respondent did not "perform" any parenting class and, although he had a substance abuse treatment assessment completed, "he did not partake in the actual treatment." Williams also stated that respondent did not complete his individual counseling requirement for the period, and only completed one drug test which returned a positive result for marijuana.

¶ 19    Respondent testified on his own behalf. He stated that on July 8, 2017, his counselor at Iroquois Mental Health informed him about the parenting class requirement. He recalled that the classes were offered in sessions twice a year and he "signed up as soon as [he] could for the next available session." Neither he nor his counselor realized that he "had to do a two-hour group class," as well as the one-on-one session. Nonetheless, he eventually "pursued group counseling." Regarding his drug testing requirement, respondent testified that he believed he had to provide "drug drops every time" he saw his "counselor at Iroquois Mental Health." He stated that he did so.

¶ 20    Respondent stated that he obtained a certificate of completion for his parenting classes outside the evaluation period, having not done so during the period because he had difficulty communicating with DCFS personnel. He accused the caseworker of being "rude" and barking "stuff" at him. He did visits with N.C. "about four [times] a month until they had changed the goal." He found the visits very productive and stated he would play with N.C. as well as sometimes changing her diapers. He explained that several visits were cancelled because of problems from DCFS and changes with the assigned caseworkers. He stated that DCFS assigned three different caseworkers, changing one after the other. He admitted that the "first two

caseworkers were real understanding and *** helpful." He recalled the third caseworker was assigned to the case around July or August 2017.

¶ 21        Ashley also testified on her own behalf and on behalf of respondent. Relevant to respondent, she stated that she lived with him during the relevant time period—July 2017 through April 2018. They did their visitations together and she had at least one opportunity to observe respondent with N.C. She stated that "he was very helpful" during the visitation, describing him as "happy" to be with N.C. Ashley agreed with respondent that the caseworker assigned the case at the time was not helpful and at times was "very unprofessional." She however admitted that the caseworker was "diligent in contacting" her about reporting requirements up until she and respondent split up and she moved out. She thought respondent "went over and beyond what he had to do" under the permanency plan.

¶ 22        Following the testimony, the trial court heard arguments from the parties, and returned its findings. The court found "that the State [had] proved by a clear and convincing evidence that each parent, [was] unfit." It explained that "the parenting classes were designed to" ensure respondent was willing "to step up and protect [N.C.] from a mother who was clearly abusive toward [her] by taking drugs while she was pregnant." The court noted that respondent was "defensive" regarding meeting his requirements. It stated that respondent did not raise his complaints about the caseworker at any of the previous hearings where he was present. The court concluded that "the State [had] met its burden of proof on the first prong of [the] termination hearing."

¶ 23        The trial court then called the case for a hearing to determine N.C.'s best interest. The State called Amanda A., the wife of N.C.'s great-uncle. Together they were N.C.'s registered foster parents. Amanda was not employed at the time of her testimony but was receiving

8

disability benefits on a regular basis. Her husband was a manager of a fertilizer company in Marco, Indiana, and earned a regular paycheck. With their combined income, they were able to care for N.C. and to provide her food, clothing, and a stable shelter.

¶ 24 In their household, there were three children and two adults. N.C. had a room to herself and had closely bonded with a younger daughter in the household. The family had lived in the same home for over two years and N.C., having been placed with the family shortly after her birth, had become familiar with the environment and had befriended children within her age group in their neighborhood. Amanda testified that N.C. had become a part of their family and that they would like to adopt her.

¶ 25 With regard to respondent's visits with N.C., Amanda testified that they had improved over time. She noted that N.C. "still want[ed] to play with her sisters and stuff when the [visitations were] going on," requiring encouragement to stay with respondent. She reported that Ashley had not visited N.C. since February 2018. On cross-examination, Amanda stated that N.C. never asked or inquired about either respondent or Ashley, observing that N.C. "kind of sees" respondent "as another person to play with."

¶ 26 Respondent also testified at the best interest hearing. He stated that he attended all the visitations with N.C. at the foster parents' home. He recalled interacting with N.C., holding and playing with her. Respondent stated that he had a three-bedroom home where he lived alone. His 10-year old son would visit him every other weekend. Respondent also testified that he was the general manager at Westside Motors in Watseka, Illinois, where he had worked since September 2008. He stated that this position was full-time.

¶ 27 Respondent testified that he completed the basic parenting class as well as an advanced parenting class. He found the classes helpful, providing him "with a lot of point of views in

9

different ways." He explained that if N.C. were to live with him, she would: (1) have her own bedroom; (2) be placed in a preschool program such as head start; and (3) would have transportation to and from the program. Respondent noted that Ashley was no longer in his life since February 2018. He wanted N.C. in his life along with his son and his 19-year old daughter who was attending college at the time.

¶ 28 On cross-examination, respondent acknowledged a conviction for manufacturing cannabis in 2017-CF-68. He also admitted a 2005 DUI conviction that required him to complete an evaluation to reinstate his license. He was working on that and was relying on his "boss' uncle" for transportation. Finally, respondent admitted that he had never had N.C. in his care for an overnight stay.

¶ 29 After hearing arguments from the parties, the trial court found that, after two years of foster care, N.C. had bonded with her foster family. It expressed concerned regarding "the drug counseling progress of either parent," and whether respondent would be able to handle his personal issues as well of those of Ashley while caring for N.C. The court did observe that since respondent "broke off with [Ashley], he was able to make some progress." The trial court thus found that the State had met its burden with respect to best interest, stating: "*** the bonding, the adoptability, and the lack of consistent progress here by both parents indicates that it's clearly in the best interest of the child that she be adopted, if possible, into the foster care home where she's been placed and elsewhere if that adoption can't go through."

¶ 30 Respondent now appeals.

¶ 31          ANALYSIS

¶ 32 Parental rights may be involuntarily terminated where (1) the State proves, by clear and convincing evidence, that a parent is unfit pursuant to grounds set forth in Section 1(D) of the

Adoption Act, and (2) the trial court finds that termination is in the child's best interests. 750 ILCS 50/1(D) (West 2019); *In re Donald A.G.*, 221 Ill.2d 234, 244 (2006). The State is not required to prove every ground it has alleged for finding a parent unfit. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 37 (citing *In re Gwynne P.*, 215 Ill.2d 340, 349 (2005)). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill.2d at 349.

¶ 33    Pursuant to the Adoption Act, a parent is unfit if he failed "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2019). Reasonable progress under section 1(D)(m)(ii) requires "demonstrable movement toward the goal of reunification." *In re C.N.*, 196 Ill.2d 181, 211 (2001). On review, the trial court's fitness determination will not be disturbed unless it is against the manifest weight of the evidence. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 38 (citing *In re Gwynne P.*, 215 Ill.2d at 354). A court's decision is against the manifest weight of the evidence where the opposite conclusion is clearly apparent. *Id.*

¶ 34    Here, the State alleged that respondent failed to make reasonable efforts to correct the conditions that were the basis of the removal of N.C. from him within nine months after the adjudication of neglect from July 14, 2017, through April 14, 2018. Alternatively, the State alleged respondent failed to make reasonable progress toward the return of N.C. to him during any of the nine-month periods after the end of the initial nine-month period following the adjudication of neglect.

¶ 35    At the fitness hearing, the evidence showed that N.C. was originally removed from respondent and Ashley at birth. After her birth, N.C. had withdrawal symptoms, difficulty

11

breathing, and an enlarged heart. Ashley admitted ingesting non-prescribed Vicodin while pregnant with N.C. She also tested positive for cocaine opiate, and THC. Relevant to respondent, the evidence also showed that he had substance abuse problems. On August 4, 2017, the trial court had ordered respondent—as well as Ashley—to comply with DCFS' service plan objectives. But a service plan report, from April 27, 2018, showed respondent had maintained a pattern of start-and-stop involvement with N.C. and had failed to meet any of the objectives.

¶ 36        In terms of his progress during the initial period, Amanda Williams testified that respondent did not participate in any parenting class and "did not partake in the actual [drug] treatment" despite completing an assessment. Respondent also failed to participate in individual counseling during the relevant period and tested positive for marijuana on the only drug drop he submitted. Respondent admitted at the hearing that he made no effort during the initial evaluation period. He claimed that it was because he had difficulties communicating with DCFS personnel.

¶ 37        We conclude that the trial court's finding that respondent was unfit was not against the manifest weight of the evidence. First, we note that respondent admitted he made no effort during the initial nine-month period. The court rejected his claim against the caseworker as "defensive" and not credible. "We *** defer to the trial court's factual findings and credibility assessments and will not reweigh the evidence anew on appeal." *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 78. The court specifically noted that respondent had not raised his claims against the agency's personnel until the termination hearing whereas he had no less than four prior opportunities at previous in-court permanency hearings, which he attended.

¶ 38        But second, respondent's individual feelings about the agency's personnel are irrelevant *vis-à-vis* his obligation to abide with the service plan. On June 2, 2017, he participated in an

interview with an Integrated Assessment Team and the permanency goal was set with the aim at returning N.C. to her parents within twelve months. On July 14, 2017, the trial court granted the State's petition, adjudicating N.C. as neglected or abused. At that hearing the court ordered both Ashley and respondent to comply with the service plan or risk termination of their parental rights. Despite this order occurring on the starting date of the initial nine-month period, respondent admitted that he made no effort to comply because of his personal animosity against the assigned caseworker. We agree with trial court's conclusion that this attitude reflects an unwillingness to protect N.C. from the abuse and neglect to which she had been exposed.

¶ 39 Respondent's failure to participate in the actual drug treatment, despite completing the assessment, cuts at the core of the risk sought to be eliminated. The evidence showed that Ashley, like respondent, had a drug abuse problem. N.C. was exposed to this problem during the pregnancy and showed physical signs of its effects at and after birth. Without completion of the actual drug treatment, the trial court could not be assured that respondent was capable of eliminating future risks to N.C. Respondent instead failed to comply with the drug testing requirement of his plan, submitting only one drug drop with a positive testing result for marijuana. This violated his requirement to "achieve and maintain a drug-free[and] safe environment for his daughter." Moreover, respondent remained in a relationship with Ashley during the initial nine-period despite her self-reported use of known controlled substances and other unknown substances that may well be controlled.

¶ 40 In addition, the plan required that respondent "engage in parenting education." Respondent failed to do so. By July 31, 2017, respondent had not made any progress towards meeting this requirement, only participating in the intake assessment sometime before October 25, 2017 and failing to complete a class during the initial nine-month period. On appeal,

respondent argues that we should consider his completion outside the nine-month period. We disagree. "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill.2d at 349. The statute gives the State the right to choose the applicable nine-month period, *see id.*, and here the State specifically alleged his failure to meet the objectives during the initial period as grounds for finding him unfit.

¶ 41        But even if we were to consider his completion of the parenting class after the initial period, the evidence is still clear and convincing in support of finding respondent unfit. As the trial court noted, the initial finding of abuse or neglect related to N.C.'s exposure *in utero* to drugs. At the time of the termination hearing, respondent had not shown reasonable progress toward mitigating the risk of continued exposure to drugs with additional harmful consequences. Reasonable progress under section 1(D)(m)(ii) requires "demonstrable movement toward the goal of reunification." *In re C.N.*, 196 Ill.2d at 211.  The court held two hearings after setting the initial evaluation period and before the fitness hearing. On September 18, 2018, after the initial period was closed, the court found that the services contained in the original plan were "appropriate to facilitate the achievement of the permanency goal." The court again ordered both respondent and Ashley to cooperate with the plan." By February 21, 2019, the agency noted that respondent continued "to engage in individual counseling," but it had not received a progress report or completion certificate for respondent's alleged participation in parenting classes. For these reasons, we hold the manifest weight of the record supports the trial court's finding that respondent was an unfit parent to N.C.

¶ 42        Once a finding of unfitness has been made, all considerations must yield to the best interest of the child. *In re O.S.*, 364 Ill. App. 3d 628, 633 (3rd Dist. 2006). At this stage of the

14

proceedings, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill.2d 347 (2004). The trial court's decision requires consideration of statutory factors, including, inter alia: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (4) the risks related to substitute care; and (5) the preferences of persons available to care for the child. 705 ILCS 405/1–3(4.05) (West 2019). The trial court's task requires the court to balance these factors, weighing them at the first instance, and places the court "in a better position to see the witnesses and judge their credibility." *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71 (internal citations and quotations marks omitted). Thus, on review, we accord the trial court's determination in a termination proceeding great deference and will not reverse it unless it is contrary to the manifest weight of the evidence. *In re O.S.*, 364 Ill. App. 3d at 633.

¶ 43        Here, the trial court had to balance two competing set of facts regarding N.C.'s best interest. First, the evidence revealed that she had been placed in foster care with Amanda and her family shortly after birth, two-and-a-half years before the hearing. During those years, the family had lived in the same home and N.C. had become familiar with the environment, closely bonding with the family, and particularly with a younger daughter in the household, and befriending children within her age group in their neighborhood.

¶ 44        On the other hand, the evidence also revealed that respondent currently had secured a home and had the ability to shelter N.C. Although the agency reports showed that his income was from selling used-auto parts on E-bay, respondent testified that he had maintained the same employment for at least eleven years, rising from a mechanic to general manager for an auto dealer. Moreover, Amanda reported that respondent's visits with N.C. had improved over time.

15

¶ 45    At first blush, these facts seem to suggest that the scales are evenly balanced. However, in reviewing a decision to terminate parental rights, we note that the trial court is "in a better position to see the witnesses and judge their credibility." *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71 (internal citations and quotations marks omitted). Respondent stated that he wants N.C. to be in his life along with his other children; Amanda testified that she and her husband—N.C.'s great uncle—want to continue providing N.C. with the care and stability they have been giving by adopting her. She also stated that N.C. required encouragement to spend time with respondent during his visits, explaining that N.C. seemed to view respondent just "as another person to play with." The testimony regarding N.C.'s relationship with her foster family and her interaction with respondent raise issues of credibility and commitment which can only be resolved by assessing actual performance.  We find nothing in the record that leads us to conclude that the trial court's assessment that the facts favored termination of respondent's parental rights was erroneous.

¶ 46    We note, as the trial court did, that respondent had showed some progress towards reunification with N.C. after he ended his relationship with Ashley. However, he arrived tardily at that position.  In the meantime, N.C. had spent virtually her entire life in the foster home and with the foster family.  Her interaction with respondent had been inconsistent, only improving to one weekly two-hour visit—as opposed to the plan's required two visits. Moreover, the trial court heard the testimony and presumably determined that Amanda was credible when she stated N.C. only considered respondent as just another playmate. The implicit corollary is that she did not view him as her father.  We note that respondent did not contradict this statement.  We find no reason not to defer to the trial court's credibility assessment. For these reasons, we conclude

that the evidence confirms that the statutory best interest factors favored terminating respondent's parental rights and that the trial court's decision based on that finding was correct.

¶ 47                                    CONCLUSION

¶ 48            The judgment of the circuit court of Iroquois County is affirmed.

¶ 49            Affirmed.